

# Fourth Court of Appeals

## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00719-CR

Luis Alonzo **PEREZ**, Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 293rd Judicial District Court, Maverick County, Texas
Trial Court No. 22-07-08349-MCR
Honorable Maribel Flores, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:    Irene Rios, Justice
Lori Massey Brissette, Justice
Adrian A. Spears II, Justice

Delivered and Filed: April 22, 2026

AFFIRMED

In three issues, appellant Luis Alonzo Perez, Jr. appeals his burglary of a habitation with attempt to commit aggravated assault conviction. Specifically, Perez contends the evidence is insufficient to support his conviction, the trial court erred in admitting extraneous offense evidence, and the trial court also erred in allowing witnesses to testify about how the incident personally impacted them. We affirm.

## BACKGROUND

Undisputedly, Perez and Brian Davila, the victim, had an acrimonious relationship. Brian was married to Alexis De Luna at the time of the incident. However, when Alexis was younger, Alexis and Perez were friends who also had a casual sexual relationship, potentially contributing to the poor relationship between Perez and Brian. One evening while Brian and Alexis were at Alexis's mother's house with several family members, Perez forced his way inside the house as he held a knife and threatened to harm Brian. Family members tried to stop Perez.

The State indicted Perez with burglary of a habitation with attempt to commit a felony, aggravated assault with a deadly weapon. A jury found Perez guilty of the alleged offense. The trial court adopted the jury's sentencing recommendation and sentenced Perez to fourteen years' imprisonment. Perez appeals.

## LEGAL SUFFICIENCY

In his first issue, Perez argues the evidence is insufficient to support his burglary of a habitation with attempt to commit aggravated assault conviction based on how the State indicted and convicted him under the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 30.02(a)(3), (d).

### A. Standard of Review

When reviewing the sufficiency of the evidence, we determine whether, "'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Witcher v. State*, 638 S.W.3d 707, 709–10 (Tex. Crim. App. 2022) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard coincides with the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. The factfinder may and should draw "reasonable inferences" from the evidence but

may not draw conclusions based on "mere speculation." *Hooper v. State*, 214 S.W.3d 9, 15–16 (Tex. Crim. App. 2007).

The factfinder alone judges the evidence's weight and credibility. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). We may not reevaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). We must presume the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *See id*.; *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) (reviewing court must not usurp the jury's role by "substituting its own judgment for that of the jury"); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (reviewing court must not sit as thirteenth juror). "Although the parties may disagree about the logical inferences that flow from undisputed facts, where there are two permissible views of the evidence, the [factfinder]'s choice between them cannot be clearly erroneous." *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (internal quotations omitted).

We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *Id*.

### B. *Applicable Law*

Specific to the State's indictment of Perez, a person commits the offense of burglary if, without the effective consent of the owner, he enters a habitation and commits or attempts to commit a felony. *See* TEX. PENAL CODE ANN. § 30.02(a)(3); *see also id.* § 22.02(b) (indicating that aggravated assault is a felony). Burglary becomes a first-degree felony offense, applicable here, when the premises is a habitation and the defendant entered and committed or attempted to commit a felony other than felony theft, such as aggravated assault in this case. *See id*. § 30.02(d). "[E]nter" as specifically defined by the burglary statute, and as charged under the indictment here, means "to intrude: (1) any part of the body; or (2) any physical object connected with the body." *Id*. § 30.02(b).

Under the facts of this case, a person commits or attempts to commit aggravated assault if the person commits or attempts to commit assault as defined by Texas Penal Code section 22.01, and the person "uses or exhibits a deadly weapon during the commission of the assault." *Id.* 22.02(a)(2). A "deadly weapon" includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B). A person commits assault if the person intentionally or knowingly threatens another with imminent bodily injury. *See id*. §22.01(a)(2). "Bodily injury" means "physical pain, illness, or any impairment of physical condition." *Id*. § 1.07(a)(8). Although not defined in the Texas Penal Code, the Texas Court of Criminal Appeals has defined "imminent" to mean "'ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near.'" *Garcia v. State*, 367 S.W.3d 683, 689 (Tex. Crim. App. 2012) (quoting *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989) (internal quotations omitted)).

A person acts intentionally, or with intent, when it is his conscious objective or desire to engage in the conduct or cause the result. *See* TEX. PENAL CODE ANN. § 6.03(a). A person acts knowingly, or with knowledge, when he is aware of the nature of his conduct or that the circumstances exist, or that his conduct is reasonably certain to cause the result. *See id*. § 6.03(b).

*C. Applicable Facts*

Juana A. De Luna lives and owns the house at which several family members live or stay, including Maria Fuentes, sister-in-law Deyanira Martinez Fuentes, and daughters Indira De Luna, Janale De Luna, Alexis De Luna Lopez, and Alejandra De Luna. On the night of the incident, Maria, Deyanira, Indira, Janale, Alejandra, Alexis, Brian, and three minor children were at the house. Juana was working out of town. She knew Perez because they had previously worked together at a fast-food restaurant. Juana testified that she had never invited Perez to her house and neither had Alexis nor Deyanira to her knowledge. With the exception of the minor children and Brian, who was deceased at the time of trial, everyone who was at the house testified at trial.

According to Alexis, the day before the incident she, Brian, and their children went to a local pizza place where she saw Perez with his family. After seeing Perez, Alexis testified she invited her sister Indira and Indira's husband to join them at the pizza place, and they did. Alexis and her family left before Perez's family. Perez's mother subsequently claimed Brian scratched her car in the parking lot. Indira acknowledged being at the local pizza place the night before the incident but claimed nothing happened to cause Perez to come to the house the night of the incident. Indira was unaware that Perez's mother's car was scratched at the pizza place.

The following night, Maria and Deyanira were going to church and had stepped outside the house when they saw the lights of a vehicle, thinking it was their ride to church. Alexis claimed that right after they stepped outside, Brian stepped outside then came back into the house, and then

she stepped outside. Once outside, Alexis saw Perez and his brother coming towards her. Alexis testified Perez appeared mad and was carrying a knife. When she stepped into his path, he began screaming in Spanish, "Get that s-- of a b----[,]" which Alexis understood as referring to Brian. Perez saw Brian inside the house and began running towards the door causing Alexis to run back inside the house. Alexis claimed her family was trying to force the door shut but could not because Perez had his foot inside the house. Alexis added that Perez had more than half his body inside the house at one time. Because Perez continued screaming and trying to come all the way into the house, Alexis explained Maria, Deyanira, Indira, and Janale all pushed on the door to prevent him from coming inside any further. Alexis said that in addition to Perez and his brother pushing the door to force it open, Perez was also stabbing the door with the knife. Perez and his brother left when they heard police sirens. Once Perez left, Alexis noticed the tires on Brian's car were slashed.

Alexis testified she asked Perez what he wanted as he rushed towards the house yelling. However, Alexis denied that she heard Perez yelling about confronting Brian regarding what allegedly happened to Perez's mother's car the night before at the pizza place. Alexis could not describe the knife Perez carried that night, but she saw the tip of it, and testified it was silver. According to Alexis, Perez was trying to get inside the house to get Brian, because despite Perez yelling for him to come out, Perez knew Brian would not voluntarily step outside of the house.

The other witnesses testified similarly. They testified Perez forced the door open enough for part of his body to enter the house. They also testified that Perez had a knife and stabbed the outside of the door with it. Except Maria, whose family members described as being in shock and unable to recall what was transpiring, the witnesses also heard Perez yelling, demanding to get to Brian. While Alexis's testimony provided some details of the incident, the other witnesses' testimony provided slightly different details.

Maria explained that she was waiting for a ride to church, and when she heard a vehicle approaching, thinking it was her ride, she opened the door and saw two men running towards her. Maria stated the older, taller one was carrying a weapon described as a knife or "jackknife." Maria saw the blade. Maria started pushing the door closed from inside the house, but the man got his foot in the house. After taking his foot out, Maria claimed that he began hitting the outside of the door with the knife, and she could feel the impact with her hand still on the door. Maria testified that she did not hear the man say anything; rather, she repeatedly told him to stop and that she had children and two pregnant women in the house. Maria did not know what Brian was doing during the incident; she only knew he was in the living room and had stood up from sitting on the couch. She denied Brian went outside when she originally opened the door. Rather, she claimed Brian did not go outside until the men left when he went out through the backdoor after seeing the tires on his car slashed.

Deyanira testified she too was waiting for the ride to church. After Maria opened the door because they thought their ride had arrived, they soon realized it was not their ride. Deyanira testified Alexis had stepped outside, and Perez was coming toward the house. Deyanira did not see Perez carrying anything. She just remembered his face. Maria attempted to close and lock the door but could not, so Indira attempted to close it. However, Perez was able to get his foot and hand inside the house and was "trying to put his face inside." Deyanira stated that Perez said to "get Brian outside, to put him outside. He wanted Brian."

After struggling with Perez's attempt to come further into the house, Deyanira testified the door was finally closed and locked. Once the door was closed, Deyanira heard Perez and his brother hitting the door with some type of weapon that she did not see, but she felt the impact on the door.

After the commotion at the front door stopped, Deyanira testified she followed Brian out the back door, and when he saw the slashed tires on his car, he tried to go to the front of the house, but she stopped him. The police then arrived. Deyanira denied that Brian went outside while Perez and his brother were at the front door of the house, even when he heard them calling for him.

Indira testified that when she saw Perez and his brother coming toward the house, she immediately stood up and went to the door because she was "trying not to let him in because, I mean, my grandma and my aunt, they're already [elderly]. My–two of my sisters were pregnant, I wasn't going to let them get hurt." She joined the others in pushing the door to keep Perez from coming inside, but Perez was able to step inside, forcing half of his body past the doorway. Indira added that as they were all struggling to get Perez out, he was screaming and trying to get to Brian. Perez was screaming and repeating, "Get him out, get him out, get Brian out[!] Get–get–get him the hell out of there[!]" Indira added that Perez also said, "Why do you think you're big sh-- and you're behind the–the woman? You're in between women and you don't want to come out." She described the scene as chaotic; everyone was screaming, scared, and did not know what to do as nothing like this had ever happened.

Indira saw both Perez and his brother with knives. She claimed that she could hear Perez and his brother stabbing the metal door of the house. In addition to the stab marks on the outside of the front door, Indira also saw the tires on Brian's car slashed after Perez left. The police showed up within minutes of Perez leaving. Indira testified she saw a third person with Perez and his brother but could not tell who it was, as it was dark, and he was standing back.

According to Janale, Maria had stepped outside thinking her ride to church had arrived, but she came back inside the house telling them it was not her ride. Janale stated Maria appeared nervous and claimed, "they were coming for her." Janale looked out the window and noticed Perez

and his brother running toward the front door; she saw Perez had a knife with a "brownish" handle. Janale explained that as Deyanira and Indira were trying to close the door, Perez and his brother were also pushing to open the door. Perez forced his foot and, at one point, half of his body inside the house. Janale called the police. Brian was in the kitchen, and Janale described him as mad and wanting to go outside, but they would not let him because it would have been Brian against Perez, who had a knife, and Perez's brother. Janale said that Brian feared what was transpiring.

Janale heard Perez screaming about getting Brian out and he thought he was very tough, and "[l]et's not be an a--. Why was he hiding behind all the women?" Janale said Perez kept repeating, "Get Brian out. Get Brian out." Janale added that she also heard Perez and his brother stabbing the door with the knives that made a squeaking noise as the knives went in and out of the metal door. Janale explained that she could see Perez when he was forcing himself inside the house as well as stabbing the door with the knife. Although Janale asked Perez what he wanted and told him to leave; Perez would not stop and kept screaming for Brian to come outside.

After hearing the police sirens, Janale said Perez and his brother ran away. After Perez left, Janale said they went outside, and she noticed the slashed tires on the passenger side of Brian's car. Janale said that during the incident, there was a lot of screaming and crying, and the children were scared.

Eagle Pass Police Department Officer Joe Rivera and now Sergeant Luis Sanchez, both wearing body-cameras, responded to the call at the house, and upon arrival noticed females waiting outside the residence. Sergeant Sanchez described the women as panicked and scared, and some were shaking. Officer Rivera noticed the slashed passenger-side tires of Brian's car. Officer Rivera also observed damage to the front door, described as two holes, and damage to the door frame. Although the witnesses were talking over one another and providing various details of the incident,

Sergeant Sanchez was informed that Perez and his brother were carrying knives and that Perez forced himself partially into the house. Based on Sergeant Sanchez's investigation, he determined that Perez made partial entry into the house intending to cause harm to Brian, who remained inside the house. According to Officer Rivera's investigation, at some point Brian had to be held back, but from what and when he did not know.

Former Eagle Pass Police Department Detective Ricardo Salazar investigated this case. In addition to the burglary case, Detective Salazar knew about the possible criminal mischief case in which Perez's mother claimed Brian had damaged her car in a parking lot at the pizza place. Based on Detective Salazar's investigation, including surveillance video of the parking lot, he could not determine that Brian damaged Perez's mother's car. When Detective Salazar investigated the present case and went to the house, he did not talk to anyone but saw the two holes in the front door. Later, Detective Salazar took statements from the females regarding the incident. Detective Salazar also contacted Perez by phone, and Perez agreed to schedule a meeting with him.

Following an evidentiary hearing addressed below, former Detective Aldolfo Garza testified about investigating what was labeled a deadly conduct case involving Perez and Brian in a local convenience store parking lot that occurred approximately six months prior to the incident at issue. According to Detective Garza, Brian contacted police complaining about Perez's actions in the parking lot. Detective Garza made a recording of clips of the surveillance video taken of the alleged incident. The video begins with Perez driving his SUV into the parking lot, parking in front of the store, and entering the store. The video then shows Perez inside at the back of the store and then gets in line to pay. After Brian enters the store, he walks past the front of the line by the cashier. It appears from the video footage that Brian and Perez exchange glances and then possibly words. The following video clip shows the parking lot after Perez is back in his SUV, and then

Brian leaves the store. Brian walks past the front of Perez's SUV toward his car that is parked on the passenger side of Perez's SUV, possibly making a gesture toward Perez. Next, Perez gets out of his SUV tucking a pistol inside his waistband. Perez walks toward Brian, which Detective Garza concludes is to confront and harm Brian. In the last clip, Perez continues approaching Brian when a woman and man exit Perez's SUV. Alexis also gets out of Brian's car. The woman from Perez's SUV steps in front of Perez attempting to hold him back, including grabbing his arms, as Perez pulls the pistol out of his waistband pointing it downward. With the pistol still in his hand, Perez moves toward Brian, who remains beside his car not responding. Detective Garza testified the video footage does not show Brian with any weapon. Brian and Alexis then get into their car and drive away as Perez stands next to his SUV. Perez gets into his SUV and exits the parking lot.

Brian did not follow up with Detective Garza. Detective Garza stated the incident was viewed as a deadly conduct offense. He explained deadly conduct occurs when someone recklessly engages in conduct that places someone else in imminent danger of serious bodily injury. *See* TEX. PENAL CODE ANN. § 22.05(a). Referring to the video of the incident, Detective Garza opined Perez's action of taking out a gun in public without regard for the consequences, such as discharging and injuring a bystander, constitutes deadly conduct. Additionally, Perez was twenty years old at the time of the incident, too young to legally own a pistol.

Alexis was called back to testify only about the parking lot incident. Alexis testified she stayed in the car with their infant. She described that as Brian was coming back from the store toward the car, she saw Perez get out of his SUV and come toward Brian. Alexis got out of the car and went toward Brian, and then she saw Perez had a gun. Alexis explained she was scared because her infant was in the car and Perez was approaching Brian.

*D. Analysis*

Perez challenges the sufficiency of the evidence based on the State's indictment. He asserts the State failed to prove he attempted to assault Brian with a deadly weapon inside a habitation. That is, Perez contends the State failed to prove he attempted to threaten Brian with imminent bodily injury while Perez was inside the residence. We disagree.

While the evidence did not indicate exactly which family members lived at the house consistently, it is undisputed that people live at the house, and thus the house is considered a habitation. *See id.* § 30.01(1) (defining "[h]abitation"). Although the witnesses' testimony varies in some respects—whether Maria, Alexis, or Brian went outside before Perez and his brother charged toward the front door, exactly how much of Perez's body came into the house, or which family members pushed at the door—all of the witnesses provided a similar account of Perez and his brother forcing the door open enough for Perez to place part of his body, particularly his foot, inside the house while they pushed back at the door trying to prevent Perez from coming completely inside the house. *See* TEX. PENAL CODE ANN. § 30.02(b)(1) (explaining for purposes of committing burglary a person "enter[s]" when he intrudes "any part of the body"). The evidence was undisputed that Perez was not invited to the house and did not have consent to enter the house.

Moreover, although the witnesses' testimony varies regarding whether Perez's brother had a knife, what kind of knife Perez had, or how Perez carried the knife, their testimony was consistent that Perez had a knife in his hand. *Id.* § 1.07(a)(17)(B); *see also Johnson v. State*, 509 S.W.3d 320, 322–23 (Tex. Crim. App. 2017) (explaining that a factfinder's determination of whether a knife is a deadly weapon depends on if the defendant's use or intended use could cause death or serious bodily injury). Additionally, apart from Maria, whose family members described as being in shock

from the incident, the rest of the witnesses heard Perez cursing and yelling for Brian to come outside and for the witnesses to put Brian outside so that Perez could have access to Brian.

Perez was not merely making a request for Brian to come outside but was yelling for Brian at the door. Perez was actively seeking him as he forcefully pushed the door open while inserting whatever part of his body he could inside the house in efforts to get to Brian. Perez did not relent in forcing the door open until he heard the police sirens. It was then that the witnesses were able to finally close the door, and Perez stopped pushing. The force Perez used to push open the door while the witnesses attempted to close it damaged the door frame. Perez also used the knife to stab the metal door, damaging it as well. Therefore, the evidence demonstrated that during the struggle at the door, while Perez was inside the house cursing and yelling that he wanted to get to Brian, Perez intentionally or knowingly threatened Brian with imminent bodily injury while displaying a deadly weapon. *See* TEX. PENAL CODE ANN. §§ 22.01(a)(2), 22.02(a)(2), 30.02(a)(3), (d); *see also Garcia*, 367 S.W.3d at 689 (defining "imminent" as "ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near.").

Therefore, we conclude a reasonable factfinder could have determined the evidence was sufficient to prove beyond a reasonable doubt that Perez committed burglary of a habitation with attempt to commit a felony, aggravated assault with a deadly weapon. *See Witcher*, 638 S.W.3d at 709–10; *see also* TEX. PENAL CODE ANN. § § 30.02(a)(3), (d).

We overrule Perez's first issue.

## EXTRANEOUS OFFENSE OR BAD ACTS EVIDENCE

In his second issue, Perez complains about the trial court's admission of testimony from former Detective Garza regarding the prior incident between Perez and Brian outside a convenience store and the admission of the surveillance video of the incident. Perez asserts the

extraneous offense evidence should have been excluded under rules 403 and 404(b) of the Texas Rules of Evidence. *See* TEX. R. EVID. 403, 404(b).

A. *Standard of Review and Applicable Law*

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. Rule 404(b), however, provides that evidence of crimes, wrongs, or other acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b)(1). "This rule prohibits [the] admission of evidence to prove a person's character from which the trier of fact is then to infer that the person acted in conformity with the character trait on the occasion in question." *Valadez v. State*, 663 S.W.3d 133, 141 (Tex. Crim. App. 2022) (internal quotation marks omitted). But it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2). "The exceptions listed under Rule 404(b) are neither mutually exclusive nor collectively exhaustive." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). "Rule 404(b) is a rule of inclusion rather than exclusion." *Id*.

"Evidence of extraneous misconduct must tend to enhance or diminish the probable existence of a fact of consequence in the case." *Valadez*, 663 S.W.3d at 141 (citations omitted). "A 'fact of consequence' may be either an elemental fact or an evidentiary fact from which an elemental fact may be inferred." *Henley v. State*, 493 S.W.3d 77, 84 (Tex. Crim. App. 2016). Even "a small nudge toward proving a fact of consequence" satisfies relevancy. *Valadez*, 663 S.W.3d at 141 (quoting *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018)). Moreover,

"[e]xtraneous misconduct evidence may be admissible to rebut a defensive theory that negates an element of the charged offense." *Id*. at 141 (citations omitted).

Nevertheless, even if the evidence is admissible under rule 404(b)(2), "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). The "plain language of [r]ule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial. Indeed, all evidence against a defendant is, by its very nature, designed to be prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013) (citations omitted). Therefore, when reviewing a rule 403 determination, an appellate court will reverse the trial court's ruling "rarely and only after a clear abuse of discretion." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (quoting *Montgomery v. State*, 810 S.W.2d 372, 392 (Tex. Crim. App. 1990)).

Although this is not an exhaustive list, courts generally balance the following factors when performing a rule 403 analysis: "(1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence." *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019); *see also Inthalangsy v. State*, 634 S.W.3d 749, 758 (Tex. Crim. App. 2021). In this context, "probative value" refers to how strongly evidence makes the existence of a "fact of consequence" "more or less probable" and to how much the proponent needs the evidence, and "unfair prejudice" refers to how likely the evidence will result in a decision

made on an "improper basis," including "an emotional one." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) (quoting *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007)).

      B.      *Applicable Facts from Rule 403, 404(b) Hearing*

Prior to providing the testimony detailed above, Detective Garza testified at a rule 403, 404(b) hearing. Detective Garza testified that he investigated the incident involving Perez and Brian at a local convenience store parking lot where Perez exited his SUV with a pistol in his waistband in clear sight and then pulled it out of his waistband holding it in his hand while confronting Brian. Detective Garza obtained surveillance video without audio from the store depicting the incident. The video shows Perez arriving in his SUV and going into the store. While Perez is waiting to check out, Brian walks into the store. After Brian walks into the store, Brian and Perez exchange glances briefly and possibly exchange words as Brian walks past the line in front of the register. Perez then exits the store and gets back in the driver's seat of his SUV. As Brian leaves the store and walks in front of Perez's SUV toward his closely parked car on the passenger side of Perez's SUV, Perez gets out of his SUV carrying the pistol in his waistband and quickly walks toward Brian. As Brian turns toward Perez, a woman exits the SUV to deter Perez. When the woman steps in front of him, Perez grabs the pistol from his waistband holding it in his hand and pointing it toward the ground. Perez and Brian exchange words while Perez holds his pistol. Another man from Perez's SUV and Alexis from Brian's car are also seen outside their vehicles. Brian and Alexis soon get into Brian's car and drive away. Perez and his passengers do the same after Brian has left the store's parking lot.

After viewing the recording, hearing Detective Garza's testimony, and considering the parties' arguments and applicable law, the trial court ruled that Detective Garza's testimony and

the surveillance video were admissible under Texas Rules of Evidence Rules 403 and 404(b). *See* TEX. R. EVID. 403, 404(b).

C.    *Analysis*

Evidence concerning Perez and Brian's adversarial relationship, especially a prior altercation between them, is relevant as it provides context for the factfinder about why Perez would enter Brian's house while threatening him. *See* TEX. R. EVID. 401. Thus, extraneous offense evidence of Perez previously engaging in deadly conduct by placing a pistol in his waistband and then pulling it out and holding it while confronting Brian in a public parking lot at a convenience store lends support to prove Perez's motive and intent to force his way inside Brian's house while threatening him. *See* TEX. R. EVID. 404(b). Additionally, Perez suggested that Brian was the initial aggressor in this case, and extraneous offense evidence regarding the prior altercation is admissible to refute Perez's defensive theory that he lacked intent in committing burglary of a habitation with attempt to commit aggravated assault with a deadly weapon. *See Valadez*, 663 S.W.3d at 141. We conclude the trial court did not abuse its discretion in determining Detective Garza's testimony and the surveillance video satisfied rule 404(b) as admissible extraneous offense evidence. *See* TEX. R. EVID. 404(b).

To determine whether the probative value of the evidence is substantially outweighed by its danger of unfair prejudice, we turn our review to the trial court's ruling against the relevant criteria by which a rule 403 decision is made. *See Colone*, 573 S.W.3d at 266. The first factor requires us to determine the probative value of the evidence. The probative value of the prior altercation tends to make it more probable than not that Perez, upon forcing his way into the house, then intentionally or knowingly threatened to assault Brian with a deadly weapon because he had previously approached Brian with a gun in hand. *See id.* at 256. This factor weighs heavily in favor

of admission. As to the second factor, the evidence might have had the potential to impress the jury by leading the jury to believe Perez has a propensity for violence. However, there is no reason to think it would irrationally and indelibly impress the jury given the detailed evidence explaining how Perez forced himself inside the house while threatening to assault Brian as he held a knife and used it to stab at the door when the other witnesses managed to hold the door closed enough to prevent Perez from coming all the way inside the house. *See Inthalangsy*, 634 S.W.3d at 758–59.

As to the third factor—the State's need to develop the evidence—the State did not spend a great deal of time on the testimony. Only two of the seventeen witnesses provided testimony on the extraneous offense, and the testimony consisted of 78 out of 724 pages of transcribed testimony of the trial transcript. *See Inthalangsy*, 634 S.W.3d 759. Additionally, in the State's closing argument, the prosecutor dedicated approximately ten percent of its closing argument to the incident, discussing it over a total of four transcribed pages out of a thirty-nine-page closing argument. *See id*. Moreover, the trial court gave a limiting instruction prior to Detective Garza's testimony, and the jury charge included a limiting instruction for considering the extraneous offense evidence as well. This factor weighs in favor of admission.

Regarding the fourth factor in a rule 403 balancing test, the State's need for the evidence was moderate. On one hand, the State had evidence from multiple witnesses involved in the burglary of a habitation with attempt to commit aggravated assault that included Perez's threat to assault Brian with a deadly weapon. On the other hand, Detective Garza's testimony and the surveillance video explicitly provided evidence of the context of Perez's acrimonious relationship with Brian and Perez's continued pursuit to confront and harm Brian. Without this evidence strengthening the State's case, and the fact that Brian was deceased at the time of trial, the State would have had to solely rely on the testimony of the witnesses regarding Perez's entering the

house while threatening to assault Brian with a deadly weapon without any context about the ongoing animosity between them. *See id.* This factor weighs in favor of admission.

Finally, there is little risk of jury confusion as to whether Perez was on trial for burglary of a habitation with attempt to commit aggravated assault involving his threats to Brian with a knife, as opposed to the extraneous offense that involved a pistol in a parking lot of a convenience store.

Applying the balancing factors to the facts of this case, we cannot conclude the trial court erred by finding the probative value of the evidence of the deadly conduct extraneous offense was substantially outweighed by the risk of unfair prejudice. *See Colone v. State*, 573 S.W.3d at 266.

Because the trial court's admission of the deadly conduct extraneous offense under rule 404(b) is within the zone of reasonable disagreement and because we cannot conclude the trial court erred by finding the probative value of the evidence was substantially outweighed by the risk of unfair prejudice, we cannot conclude the trial court abused its discretion by admitting evidence of the extraneous offense.

We overrule Perez's second issue.

### ALLEGED IMPACT TESTIMONY

In his last issue, Perez argues the trial court erred by admitting testimony from several witnesses regarding how they felt during the incident. Particularly, Perez complains in his initial appellate brief that this alleged impact testimony was irrelevant and prejudicial, triggering a rule 403 analysis like that in his second appellate issue. Nonetheless, following the State's responsive brief, Perez acknowledges that he failed to make proper objections at trial to this evidence; and thus, has waived a rule 403 review. *See* TEX. R. APP. P. 33.1(a)(1); TEX. R. EVID. 403; *see also Keller v. State*, 604 S.W.3d 214, 228 (Tex. App.—Dallas 2020, pet. ref'd) (denying appellate

review because defendant failed to make proper rule 403 objection). We agree and therefore limit our review to whether the trial court admitted alleged irrelevant evidence.

## A. Standard of Review and Applicable Law

As stated above, we review evidentiary rulings under an abuse-of-discretion standard. *Jenkins v. State*, 493 S.W.3d 583, 609 (Tex. Crim. App. 2016). A trial court does not abuse its discretion if the decision to admit evidence is within the "zone of reasonable disagreement." *De La Paz*, 279 S.W.3d at 343 (citing *Montgomery*, 810 S.W.2d at 391). We will not disturb the trial court's ruling if it is correct under any applicable theory of law. *See id.*

Also, as provided above, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. "Evidence does not need to prove or disprove a particular fact by itself to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving a fact of consequence." *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018) (citations omitted). "A 'fact of consequence' includes either an elemental fact or an evidentiary fact from which an elemental fact can be inferred." *Henley*, 493 S.W.3d at 84.

## B. Challenged Testimony

Perez objected to the following testimony on various grounds, all of which objections were overruled by the trial court,

- Maria testified that she felt, "Fear[,] [b]ecause I had two persons in the house that were pregnant, my children. And we were—we felt alone. Because I had never experienced that. Something that changed our lives completely in the family."

- Deyanira explained the event by stating, "It was—it was very—it impacted me quite a bit when I saw the face of the young man with such hate that he wanted to harm us. And—and I will never forget that face in my dreams and in my nightmares."
- Indira claimed that throughout the struggle she "feared for [her] life, . . . feared for every—my sisters' lives." Indira then expounded stating, "I feel—more than

anything. I feel scared. I feared that I had to—just being 16—I was 17 at the time, being 17 and having to protect everybody in my house, I didn't want anybody to get hurt. I was young, I mean, I'm still young, right, but I was like—being just 17 and going through something like that and having to protect my grandma, having to protect my sisters that had another life in them because you never know who he—what I saw, that he wanted to get towards Brian[.]"

- Janale testified that she felt useless because she was pregnant and that her pregnancy was "a really high-risk pregnancy[,]" adding she feared for the life of her unborn child and that she "didn't have the strength to push [Perez] back[.]"

*C. Analysis*

Perez argues the State elicited this alleged irrelevant evidence from the witnesses only to gain the jury's sympathy. However, during trial and on appeal, Perez contends that he did not attempt to enter the house, Brian was the initial aggressor during the incident, and the witnesses' recollections of the incident were not credible because their testimony contained inconsistencies from prior statements made to police and inconsistencies among each other as to what transpired. Additionally, Perez argues that even if we conclude part of his body was inside the house, there is no evidence indicating he intended to assault Brian.

Whether Perez possessed the requisite intent to assault Brian with a deadly weapon once he entered the house is an element the State had to prove for the jury to convict Perez of burglary of a habitation with attempt to commit aggravated assault with a deadly weapon. *See* TEX. PENAL CODE ANN. §§ 22.02(a)(2); 30.02(a)(3), (d). First, because Brian was deceased at the time of trial, the jury was unable to hear Brian's account of the incident. And, in this case, it is undisputed that Perez did not cause Brian bodily injury; rather, the State alleged Perez attempted to commit aggravated assault—the alleged felony in this burglary of a habitation case—by threatening Brian with imminent bodily injury while exhibiting a deadly weapon. *See id.* §§ 22.01(a)(2); 22.02(a)(2).

The witnesses' testimony related to the intensity and overall impact of the events as a result of Perez's physical strength and force in his unrelenting attempt to open the door, while demanding

access to Brian and using a knife to stab the outside of the door. The evidence was relevant in determining whether Perez's behavior constituted a threat of imminent bodily injury to Brian. The witnesses' complete perception of the incident, including their testimony regarding their fear, aided the jury in making its determination of a fact of consequence. *Gonzalez*, 544 S.W.3d at 370; *Henley*, 493 S.W.3d at 84.

Therefore, we overrule Perez's third issue.

## CONCLUSION

Having overruled all of Perez's appellate issues, we affirm the trial court's final judgment of conviction.

Irene Rios, Justice

DO NOT PUBLISH